[No. E046646. Fourth Dist., Div. Two. Nov. 20, 2009.]

INYO CITIZENS FOR BETTER PLANNING, Plaintiff and Appellant, v.
INYO COUNTY BOARD OF SUPERVISORS et al., Defendants and
Respondents;
JAMES CORE et al., Real Parties in Interest and Respondents.

2

4

COUNSEL

Newmeyer & Dillion, Charles S. Krolikowski; Law Offices of James D. Bassage and James D. Bassage for Plaintiff and Appellant.

Liebersbach, Mohun, Carney & Reed, James S. Reed, Richard W. Liebersbach; Paul N. Bruce, County Counsel, and Randy Keller, Deputy County Counsel, for Defendants and Respondents and for Real Parties in Interest and Respondents.

## OPINION

**MILLER, J.**—Inyo Citizens for Better Planning (ICBP) petitioned the trial court for a writ of mandate directing Inyo County (the County), the Inyo County Board of Supervisors (the Board), the Inyo County Planning Commission (the Planning Commission), and the Inyo County Planning Department (the Planning Department) to (1) set aside the 2001 county general plan amendment that alters the definition of "net acreage" (GPA), for failure to prepare an environmental impact report (EIR); (2) begin the EIR process for the GPA; (3) set aside approval of tentative parcel maps (TPM) Nos. 357, 358, and 350, for failure to prepare an EIR and failure to meet the zoning codes; and (4) direct the County to cease processing TPM's Nos. 357, 358, and 350 until the court determines if the project complies with the general plan, the California Environmental Quality Act (CEQA; Pub. Resources Code,

§ 21000 et seq.), and the zoning codes. ICBP also requested declaratory and injunctive relief. The trial court denied ICBP's (1) petitions for writ of mandate; (2) requests for declaratory relief; and (3) requests for injunctive relief. ICBP contends (1) substantial evidence supports a finding that the GPA could have a significant impact on the environment, therefore, the County should have prepared an EIR; (2) TPM's Nos. 357, 358, and 350 do not meet the minimum lot size requirements; and (3) EIR's should have been prepared for TPM's Nos. 357, 358, and 350. We reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL HISTORY

The 2001 county general plan defined "net acreage" as "the remainder of land left after land devoted to streets, roads, and utilities are deducted from the parcel." The Planning Department became concerned that the 2001 definition of net acreage was confusing and could result in some parcels being rendered too small for development because the phrase " 'devoted to' " is unclear. Essentially, the concern was that property devoted to a utility easement should not have to be deducted from the net acreage calculation because the land was still useable, despite being encumbered by an easement. The Planning Department recommended that the Board alter the definition of net acreage.

The Planning Department adopted a negative declaration in support of its recommendation that the definition be altered. Many citizens of the County opposed the plan to alter the definition of net acreage. In particular, neighbors in an area known as the McLaren Ranch subdivision were opposed to altering the definition of net acreage because it would essentially permit three neighbors to move forward with their plans to subdivide their properties. Specifically, the McLaren Ranch neighbors were opposed to the subdivisions planned in TPM's Nos. 350, 357, and 358. The neighbors were also concerned that more people would begin subdividing their property under the new definition, and that environmental resources, such as water and wildlife, would be adversely impacted. The neighbors asserted that the negative declaration did not adequately anticipate the potential for greater residential growth under the altered definition of net acreage.

The County argued that the 2001 general plan, and the EIR prepared for the 2001 general plan, already anticipated the amount of growth that would be permitted under the altered definition of net acreage because the County always intended net acreage to be interpreted as including easement properties—the County was only altering the definition to clarify its longtime policy. In other words, the growth anticipated by the definition of net acreage in the GPA was no greater than the growth anticipated by the definition of net acreage in the 2001 general plan, and therefore, a new EIR was not required.

On February 1, 2005, the Board adopted the negative declaration and approved the altered definition of net acreage in the GPA. The GPA definition of net acreage defined the term as "[t]he remainder of a parcel or piece of property after land dedicated or otherwise encumbered by an easement and/or right-of-way for a public street or road, including a County road, is deducted from the gross acreage or gross parcel size." The Board also approved TPM's Nos. 350, 357, and 358.

## DISCUSSION

### A. *Legal Background—Three-step CEQA Process*

We begin with a brief background of the CEQA process.

■ "Consistent with California's strong environmental policy, whenever the approval of a project is at issue, the statute and regulations 'have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations.' [Citations.]

"[1.] *Threshold Determination of CEQA's Applicability*

" 'The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity. [Citations.]' [Citation.] CEQA applies if the activity is a 'project' under the statutory definition, unless the project is exempt. [Citations.] 'If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary.' [Citation.] In such cases, the agency may file a notice of CEQA exemption, if it chooses to do so. [Citations.]

"If the project is not exempt—either because it does not fall within an exempt category or because an exception makes the exemption unavailable— then the agency must proceed to the second tier and conduct an initial study. [Citations.]

"[2.] *Initial Study*

"The second tier of the process, the initial study, serves several purposes. One purpose is to inform the choice between a negative declaration and an [EIR]. [Citations.] Another of the initial study's purposes is to eliminate unnecessary [EIR's]. [Citation.]

" 'CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial

evidence that the project may have a significant effect on the environment.' [Citations.] In certain situations where a straightforward negative declaration is not appropriate, the agency may permit the use of a mitigated negative declaration. [Citations.]

"[3.] *Environmental Impact Report*

"If the project does not qualify for a negative declaration, 'the third step in the process is to prepare a full environmental impact report . . . .' [Citations.]

"The California Supreme Court has 'repeatedly recognized that the EIR is the "heart of CEQA." ' [Citation.] As the court observed more than three decades ago, 'since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citation.] Other cases have since confirmed the statutory preference for resolving doubts in favor of an EIR. [Citations.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1372–1374 [44 Cal.Rptr.3d 128].)

B. *Substantial Evidence*

ICBP contends that substantial evidence supports a finding that the GPA could have a significant impact on the environment, and therefore, the County should have prepared an EIR. We agree.

The issue of whether an EIR must be prepared is resolved by applying the fair argument test. "We have [previously] described this test as follows: 'Under [Public Resources Code] section 21151, a local agency . . . ordinarily must prepare an EIR on any project which *"may* have a significant effect on the environment." [Citations.] Conversely, an agency may adopt a negative declaration only if there is no substantial evidence that the project *"may* have a significant effect on the environment." [Citations.] [¶] A trial court therefore reviews an agency's decision to adopt a negative declaration using the "fair argument" test. Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment. [Citations.] "If such evidence is found, it cannot be overcome by substantial evidence to the contrary." [Citations.] [¶] "The lead agency's determination is thus largely legal rather than factual; it does not resolve conflicts in the evidence but determines only whether substantial evidence exists in the record to support the prescribed fair argument." [Citation.] The court's

"function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made." [Citation.]' [Citations.]" (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389 [83 Cal.Rptr.2d 836], fn. omitted.) "If such evidence exists, [then] the court must set aside the agency's decision to adopt a negative declaration as an abuse of discretion in failing to proceed in a manner as required by law." (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 405 [117 Cal.Rptr.2d 582], fn. omitted.)

" 'On appeal, the appellate court's "task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law." [Citation.] The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]' " (*Burrtec Waste Industries, Inc. v. City of Colton* (2002) 97 Cal.App.4th 1133, 1139 [119 Cal.Rptr.2d 410], fn. omitted.)

■ "The following does not qualify as substantial evidence under CEQA: 'argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment.' Substantial evidence, instead, consists of 'fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact.' " (*City of Redlands v. County of San Bernardino, supra*, 96 Cal.App.4th at p. 410, fns. omitted.)

The Bishop Creek Water Association (BCWA) submitted a letter informing the County that a portion of the area affected by the GPA "already experiences problems with low water during months when minimal flows are released in Bishop Creek." The BCWA believed that the GPA would "create an increase in the number of subdivision applications." The BCWA expressed concern that the GPA would result in more water usage, which would "have a negative impact [on] the aquatic resources in the area." Further the BCWA assumed that changing the definition of net acreage, to include utility and ditch easements, would further complicate the BCWA's ability to control water resources, because it would limit access to irrigation ditches.

In one area affected by the GPA, the McLaren Ranch subdivision, residents used the ditches to irrigate the land for farming and ranching. Virtually every parcel of property within the McLaren Ranch subdivision bordered one or more ditch. The ditches and irrigation ponds were also used by firefighters to control fires in the area.

Davis Moxley, who owned a department of water and power lease just east of an area that would be impacted by the GPA, expressed concern that the

County did not assess the amount of groundwater that would be pumped for domestic uses as a result of amending the definition of net acreage. Moxley noted that "it use[d] to be common to hit ground water at 2–3 feet[, but] today there is no water at 4–5 sometimes 6 feet." Moxley further noted that the 80 acres on the southern end of his lease, which had been "grain and green pastures," was "now sagebrush and weeds."

Jacqueline Harris, who lived in an area affected by the GPA, wrote that she and her neighbors accessed water by drilling wells on their properties, and relied on septic systems for wastewater. Harris questioned whether it would be possible to design wells and septic systems on properties that had minimal acreage, and whether the impacted area could accommodate new wells.

Dennis and Phillis Reed, who lived in an area affected by the GPA, wrote, "Several deep chasms have been encountered with recently drilled wells. Some of them are over one hundred feet in depth." The Reeds expressed concern about wastewater from septic systems crossing with well water, if people were required to drill deeper wells near large chasms.

A special agent for the National Park Service, with 25 years of experience, submitted a declaration claiming that the change in the definition of net acreage could have an adverse impact on the environment. Specifically, the special agent listed a variety of birds that frequented the area affected by the GPA, such as the Ruddy Ground Dove, Nuttall's Woodpecker, and Bewick's Wren, and expressed concern that the diverse birdlife would be adversely affected by increased domestic water usage in the area, because increased residential density would lower groundwater levels, reduce open space, and degrade surface waters.

Chuck Thistlethwaite, planning director for the County, told the Board in January 2002 that a strict interpretation of the 2001 general plan's definition of net acreage "could have countywide implications and virtually place a moratorium on development in every area of the county."

The foregoing evidence showed (1) there were months when water flowing to areas affected by the GPA was very low; (2) over the years, the water table had dropped from approximately three feet to approximately five feet; (3) a lower water table resulted in a change in plantlife, from grass to sagebrush; (4) a variety of birds lived in the area affected by the GPA; and (5) a strict interpretation of the 2001 general plan would not permit most of the building authorized under the GPA.

Reasonable assumptions made from these facts were (1) allowing greater residential density might have an adverse impact on water resources;

(2) strained water resources might adversely affect plantlife and birdlife; and (3) subdivisions and residential building that would not be authorized under the 2001 general plan might be permitted under the GPA.

■ Based upon the foregoing evidence and related reasonable assumptions, we conclude that the record contains substantial evidence supporting a fair argument that the GPA may have a significant effect on the environment, in particular on water, flora, and fauna. Accordingly, we conclude that the County abused its discretion when it determined that there was no substantial evidence that the GPA might have a significant effect on the environment. In other words, the County should have prepared an EIR, rather than a negative declaration.

The County contends there is not substantial evidence supporting a fair argument that the GPA may have a significant effect on the environment, because "the GPA was meant to clarify the net acreage requirement . . . to be interpreted in conformance with long-standing Inyo County practices." Essentially, the County asserts that the definition of net acreage set forth in the GPA is the same definition used in the 1984 county general plan; however, when the 2001 county general plan was published, the definition of net acreage became confusing. The County asserts that it is simply trying to clarify that it still intends to use the 1984 definition of net acreage. Further, the County contends that since it always intended to use the 1984 definition of net acreage, the clarification of this policy would not have a significant environmental impact beyond that already anticipated by the 2001 general plan.

The County's argument fails because a strict interpretation of the 2001 general plan definition of net acreage would not authorize the residential building that may be permitted under the GPA definition of net acreage. Accordingly, it is not reasonable to contend that the residential building permitted by the GPA definition of net acreage was always anticipated within the 2001 general plan. For example, Thistlethwaite told the Board "that a strict interpretation of the [2001 definition of net acreage] could have countywide implications and virtually place a moratorium on development in every area of the county."

Moreover, on an October 5, 2004, board agenda request form, signed by Leslie Klusmire, planning director for the County, various options were set forth for the definition of net acreage, such as whether or not to include private driveway easements within the definition. Consequently, it does not appear from the record that the change in the definition of net acreage was merely a clarification of existing policies, because the definition was debated and different options were discussed. In sum, the County's argument is unpersuasive.

## C. *Cumulative Impact*

ICBP contends the negative declaration is deficient because it does not analyze the cumulative impacts to the environment that will result from the GPA. We elect not to discuss this contention because we have concluded, *ante*, that the County should have prepared an EIR, rather than a negative declaration.

## D. *Deficient Negative Declaration*

ICBP contends the County's negative declaration was deficient because (1) it did not accurately describe the project, characterizing it as a clarification of existing policy, rather than recognizing the potential impacts for greater residential density; (2) it only analyzed the modified definition of net acreage in regard to two zoning designations, despite the County's having nine different zoning designations; and (3) it did not analyze the relationship between the County's allegedly deteriorating utilities and the potential for increased residential density. We do not discuss the foregoing contentions because we have concluded, *ante*, that the County should have prepared an EIR, rather than a negative declaration.

## E. *TPM No. 357*

### 1. *Facts*

James and Mary Core (the Cores) owned a property in the County that was zoned "Residential Very Low density" (RVL). The RVL designation required a half-acre minimum residential lot size, and a maximum of two residential dwelling units per acre. On February 8, 2002, the Cores met with County officials to discuss subdividing their property into two parcels. On February 14, 2002, the Cores sent a letter to the Planning Department stating their intent to delay their application to subdivide their property until after the GPA was passed. In their application, the Cores wrote that they owned a 1.17-acre parcel of property, which they planned to divide into one 0.6-acre parcel and one 0.57-acre parcel.

On July 28, 2004, the County began moving forward with the Cores' application to subdivide their property. On October 12, 2004, the County prepared a mitigated negative declaration related to the Cores' subdivision. The County found that a mitigated negative declaration, rather than a plain negative declaration, was necessary due to "inadequate emergency access requirements"; however, the County concluded there would not be a significant effect on the environment because the impacts would be mitigated by an

emergency access easement. The mitigated negative declaration described the project as subdividing "a 1.12[-]acre property into two separate parcels of 0.56 acres each."

On December 1, 2004, the Planning Commission approved TPM No. 357, with the condition that an access easement be granted for parcel No. 2. On December 3, 2004, the planning director determined that TPM No. 357 would not have a significant effect on the environment, and that a mitigated negative declaration was properly prepared for the project.

On December 15, 2004, various neighbors in the vicinity of the Cores' property filed an appeal with the Board regarding the decision to subdivide the Cores' property. At the Board meeting, Joan Lewis, a neighbor of the Cores, said that once the various easements were deducted from the Cores' property, their net acreage totaled 0.913 acre, which was not sufficient space for subdividing. Andy Holmes, a former member of the Bishop Community Plan Advisory Committee,[1] told the Board that Lewis's calculation of the net acreage was incorrect, because she deducted a ditch easement from the gross acreage. Holmes explained that "ditch easements have never been considered utility easements. . . . [D]itches are considered [to be] amenities to property . . . , and certainly have never been deducted from . . . [gross] acreage calculations." Further, Holmes said that if the ditch easement were included in the net acreage, then the Cores had over one acre of property to subdivide. It appears from the map for TPM No. 357 that there are several easements on the property, such as (1) a road easement, (2) a six-foot ditch easement, and (3) a 30-foot ditch easement. On January 11, 2005, the Board affirmed the Planning Commission's decision to approve TPM No. 357.

The trial court found that TPM No. 357 met the minimum lot size by relying on the presumption set forth in Evidence Code section 664, that an "official duty has been regularly performed." The trial court concluded that ICBP did not produce any evidence tending to show that the County had improperly calculated the net acreage of the Cores' property. Accordingly, the trial court found that TPM No. 357 met the minimum lot size requirement.

## 2. *Discussion*

ICBP contends that the approval of TPM No. 357 must be set aside, because (1) the subdivision does not meet the half-acre minimum lot size requirement; (2) the public facilities at TPM No. 357 are inadequate; and (3) there is substantial evidence that the subdivision may have a significant impact on the environment, and therefore an EIR must be prepared. We disagree.

---

[1] In its reply brief, the County asserts that Holmes is an engineer; however, the County provides no record citation for this assertion.

## (a) *Minimum Lot Size*

ICBP essentially contends the trial court erred by finding that TPM No. 357 met the minimum lot size because substantial evidence does not support such a finding.

"Where, as here, the trial court was called upon to decide whether an agency's administrative decision was supported by substantial evidence, the function of the appellate court is the same as that of the trial court, that is, to review the administrative decision to determine whether it is supported by substantial evidence. [Citation.] 'Substantial evidence has been defined as relevant evidence that a reasonable mind might accept as adequate support for a conclusion. [Citation.] A presumption exists that an administrative action was supported by substantial evidence. [Citation.] The burden is on the appellant to show there is no substantial evidence whatsoever to support the findings of the [agency].' [Citation.]" (*Bhatt v. State Dept. of Health Services* (2005) 133 Cal.App.4th 923, 928 [35 Cal.Rptr.3d 335].)

On January 11, 2005, the Board affirmed the Planning Commission's decision to approve TPM No. 357. The definition of net acreage was changed pursuant to the GPA on February 1, 2005. Therefore, when analyzing the lot size, the definition of net acreage from the 2001 general plan was applicable. Under the 2001 general plan, net acreage was defined as "the remainder of land left after land devoted to streets, roads, and utilities are deducted from the parcel." At the time that TPM No. 357 was approved, the neighborhood was zoned for lots that were a minimum of one-half acre.

The presumption that an official duty has been regularly performed (Evid. Code, § 664) shifts the burden of proving the foundational issue of trustworthiness of the official action to the party objecting to the court's reliance on the official action. (*Bhatt v. State Dept. of Health Services, supra*, 133 Cal.App.4th at p. 931.)

In this case, the Planning Department and the Board determined that the Cores' lot was 1.12 acres, and that it included sufficient net acreage for subdividing. ICBP did not present a legal argument or evidence that it was improper to include the ditch easements when calculating the net acreage. Accordingly, we conclude substantial evidence supports the conclusion that the subdivided lots met the minimum acreage requirement, because the

administrative agencies determined the lots were the proper size, and ICBP has not shown that the calculation was incorrect.[2]

### (b) *Public Facilities*

ICBP contends substantial evidence does not support the County's conclusion that adequate public facilities are available for TPM No. 357. ICBP writes that "water service, access and fire protection [are] either failing or inadequate." ICBP does not explain how the services are inadequate or what evidence supports the conclusion that the facilities are inadequate.

■ "We are not required to search the record to ascertain whether it contains support for [ICBP's] contentions." (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 [35 Cal.Rptr.2d 574] (*Mansell*).) We do not serve as "backup appellate counsel," or make the parties' arguments for them. (*Id.* at p. 546.) Consequently, the issue, to the extent one has been raised, is waived. (*Ibid.*)

### (c) *EIR*

ICBP contends "substantial evidence was submitted to the County that the density-increasing aspect of the subdivision, as well as its impacts to water quality/quantity, traffic, access, and fire-safety, necessitated the preparation of an EIR to analyze the impacts."

ICBP does nothing to explain (1) what evidence was submitted or (2) why the agency erred by relying on the evidence supporting the use of a mitigated negative declaration. ICBP cites to various pages of the administrative record; however, it does not specify the significance of the citations. For example, ICBP cites to a page of the administrative record that contains a transcript from an oral hearing, but does not inform this court of the significance of the hearing or how the evidence from the hearing supports ICBP's argument. As noted *ante*, this court will not make the parties' arguments for them. (*Mansell, supra*, 30 Cal.App.4th at p. 546.) Accordingly, to the extent the issue was raised, we deem it waived.

---

[2] In ICBP's reply brief, it raises a supplemental argument that TPM No. 357 should be voided because it does not include a vesting parcel map and, since the neighborhood had since been rezoned to a one-acre minimum lot size, the subdivision no longer met the minimum lot size requirement, since a nonvesting map was subject to new laws and regulations. ICBP does not explain why it did not raise this theory, regarding vesting maps, in its opening brief. It is improper to raise new contentions in the reply brief. Therefore, the contention is forfeited. (*Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1001, fn. 2 [42 Cal.Rptr.3d 68].)

### F. *TPM No. 358*

ICBP contends that the approval of TPM No. 358 must be set aside because (1) the subdivision does not meet the half-acre minimum lot size; (2) the public facilities at TPM No. 358 are inadequate; and (3) there is substantial evidence that the subdivision might have a significant impact on the environment, and therefore an EIR must be prepared. We disagree.

#### 1. *Minimum Lot Size*

ICBP contends TPM No. 358 does not meet the minimum half-acre lot requirement. ICBP asserts that the original parcel is 1.5 gross acres; however, the property owners subdivided the land so that one parcel would be 0.56 acre. ICBP contends that after streets, roads, and utility easements are deducted, the subdivided parcel does not meet the half-acre minimum lot size requirement.

ICBP does not explain what streets, roads, or utility easements should have been deducted from the net acreage calculation. ICBP does not explain how much net acreage would remain after the various easements were deducted. Finally, ICBP does not explain what evidence, if any, supports their view that the calculation was incorrect. Accordingly, we deem the issue waived. (*Mansell, supra*, 30 Cal.App.4th at p. 546.)

#### 2. *Public Facilities*

ICBP contends TPM No. 358 must be set aside because there was no evidence to support the County's findings that adequate public facilities are available to support buildings at TPM No. 358. ICBP cites no evidence in support of its argument that the facilities are inadequate, nor does ICBP explain how the County reached its allegedly flawed conclusion. Consequently, we deem the issue waived because we will not make the argument for ICBP. (*Mansell, supra*, 30 Cal.App.4th at p. 546.)

#### 3. *EIR*

ICBP contends that TMP No. 358 must be set aside because substantial evidence was submitted proving that the subdivision would have significant impacts on water, access to public roads, fire safety, and wildlife. Once again, ICBP cites to the administrative record, but provides no insight into the significance, if any, of its citations. For example, ICBP cites to a letter from two individuals to the Planning Department; however, it is unclear what support the letter is meant to provide for ICBP's argument. Consequently, we

deem the issue waived because we will not make the argument for ICBP. (*Mansell, supra*, 30 Cal.App.4th at p. 546.)

G. *TPM No. 350*

ICBP contends that the approval of TPM No. 350 must be set aside because (1) the subdivision does not meet the half-acre minimum lot size; (2) the public facilities at TPM No. 350 are inadequate; and (3) there is substantial evidence that the subdivision might have a significant impact on the environment, and therefore, an EIR must be prepared. We disagree.

1. *Minimum Lot Size*

ICBP asserts that to the extent the GPA, i.e., the revised definition of net acreage, is set aside, TPM No. 350 does not meet the minimum lot size requirement, because it only meets the size requirement under the revised definition of net acreage. ICBP does not explain what easements, roads, or other factors cause TPM No. 350 to fall short of the required lot size. ICBP does not explain how many net acres would be included under the GPA definition of net acreage versus the 2001 general plan definition of net acreage. In other words, ICBP has not explained its contention or how the County erred; ICBP has merely concluded that an error was made. Consequently, to the extent the issue was raised, we deem it waived because we will not make the parties' arguments for them. (*Mansell, supra*, 30 Cal.App.4th at p. 546.)

2. *Public Facilities*

ICBP contends there was not substantial evidence to support the conclusion that adequate public facilities were available for buildings at TPM No. 350. ICBP does not explain how the public facilities are inadequate. This court cannot search the record to make ICBP's argument. Accordingly, we deem the issue waived. (*Mansell, supra*, 30 Cal.App.4th at p. 546.)

3. *EIR*

ICBP asserts that TPM No. 350 should be set aside because substantial evidence shows that TPM No. 350 may have a significant impact on the environment, specifically water, wildlife, emergency access, fire safety, and traffic; however, ICBP does not explain what substantial evidence supports this argument. ICBP cites to the administrative record, but does not explain the significance of the citations. Accordingly, we deem the issue waived.

## DISPOSITION

The orders denying writs of mandate (1) setting aside the GPA, specifically the definition of "net acreage," and (2) directing the County to begin the EIR process, are reversed. The trial court is directed to issue writs of mandate (1) setting aside the GPA, specifically the definition of "net acreage," and (2) directing the County to begin the EIR process, should it elect to move forward with the GPA following the decision of this court. In all other respects, the orders of the trial court are affirmed. Each side is to bear its own costs.

Ramirez, P. J., and McKinster, J., concurred.