Filed 4/25/23 In re B.T. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re B.T., a Person Coming Under the Juvenile Court Law.<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>M.R.,<br><br>     Defendant and Appellant. | G062013<br><br>(Super. Ct. No. 20DP1184)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Vibhav Mittal, Judge. Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*     \*     \*

B.T. was removed from M.R.'s (Mother) care when he was nine months old. The juvenile court eventually ended Mother's reunification services and set a hearing to terminate her parental rights under Welfare and Institutions Code section 366.26.[1] Prior to the hearing, she filed a petition under section 388 seeking to have reunification services reinstituted. Following a combined hearing, the court denied Mother's section 388 petition and terminated her parental rights. As to the section 388 petition, the court found Mother had not shown a change in circumstances, nor had she shown that resuming reunification services was in B.T.'s best interests. As for the termination of parental rights, the court rejected Mother's argument for application of the parental-benefit exception (§ 366.26, subd. (c)(1)(B)(i)) and sibling-relationship exception (§ 366.26, subd. (c)(1)(B)(v)).

Mother challenges the juvenile court's order on appeal. We find no error. As to the section 388 petition, the court initially ended reunification services because of Mother's inconsistent visitation. While Mother's visitation later improved, it still remained inconsistent at the time of the hearing on the section 388 petition. With regard to the termination of her parental rights, Mother has failed to show that severing B.T.'s relationship with her or with B.T.'s sibling, R.T., would be sufficiently detrimental to B.T. to override the strong presumption in favor of adoption. Thus, we affirm the court's order.

I

FACTS AND PROCEDURAL HISTORY

A. *Prior Dependency Cases of B.T.'s Siblings*

A few years prior to B.T.'s birth, Mother was involved in dependency cases concerning B.T.'s half sibling, K.S., and full-sibling, B.J.T. Both were declared

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

dependents of the juvenile court in 2017. Jurisdiction was based on Mother's substance abuse, unresolved mental health issues, and domestic violence between Mother and B.J.T.'s father, who is also B.T.'s father (Father). The dependency case involving K.S. was terminated in December 2017, with K.S. being left in her father's care with exit orders. As to B.J.T., Mother and Father's parental rights were terminated in July 2018, and he was adopted by his paternal grandmother in March 2019.

*B. B.T.'s Removal*

B.T. was born in December 2019. He was taken into protective custody on September 17, 2020, based on allegations of general neglect. At the time, B.T., B.J.T., Mother, Father, and the boys' paternal grandmother shared an apartment. Mother and Father had been living together since December 2019, in violation of a criminal protective order protecting Mother from Father. Nearly two weeks before B.T. was taken into protective custody, Mother had taken B.T. and B.J.T. for a walk around their apartment complex. Mother purportedly started a fire in the complex after B.J.T. requested that she do so. B.J.T. helped stomp the fire out with his feet. A few days later, a bag containing methamphetamine and heroin was found on the floor of Mother and Father's bedroom. Father admitted to using drugs. Mother also had a history of substance abuse. When B.T. was taken into protective custody, Mother was on probation for multiple DUI's. Her probation was scheduled to end in February 2024. Days before B.T.'s birth, she had been terminated from a residential drug treatment program after testing positive for opiates. Prior to B.T.'s removal, she had failed to submit to drug testing for probation on multiple occasions as she repeatedly claimed to have COVID-19 symptoms.

On September 21, 2020, the Orange County Social Services Agency (SSA) filed a petition claiming jurisdiction over B.T. was proper under section 300, subdivisions (b)(1) and (j). As to jurisdiction under section 300, subdivision (b)(1), the petition

3

repeated the allegations above regarding the drugs found in the home and the fire at the apartment complex. It also alleged Mother and Father had unresolved substance abuse issues, a long history of domestic violence, and criminal histories. Mother had multiple arrests and/or convictions for driving under the influence of alcohol and driving with a suspended license. As to jurisdiction under section 300, subdivision (j), which pertains to abuse or neglect of a sibling, the petition summarized the dependency cases of B.J.T. and K.S.

A few days after SSA filed the petition, the juvenile court ordered that B.T. be detained from Mother and Father. Mother was authorized "liberal" video and phone calls and eight hours of supervised visitation per week. The court also authorized SSA to perform random drug and alcohol tests on Mother and Father.

## C. Jurisdiction and Disposition Hearings

Prior to the jurisdiction and disposition hearings, SSA recommended that the petition be sustained, that B.T. be declared a dependent of the juvenile court, that Mother and Father be denied reunification services, and that the court schedule a hearing under section 366.26 to terminate parental rights. SSA believed reunification services would not be in B.T.'s best interests based on K.S. and B.J.T.'s dependency cases and Mother and Father's history of substance abuse. SSA noted that Mother had been offered services in K.S. and B.J.T.'s dependency cases, but she continued to have the same substance abuse issues. For instance, at the time, Mother was facing termination from her DUI court program for failing to mitigate the reasons for her past offenses. The probation officer also reported that Mother had recently tested positive for methadone. Mother was also briefly jailed in December 2020 for violating the terms of her probation.

B.T. was placed in the care of his paternal cousin (the caregiver) and her spouse in November 2020, and he has remained with them throughout this case. Mother

4

entered inpatient drug treatment in January 2021. Around this time, SSA learned Mother was pregnant with another child of Father.

On January 6, 2021, the juvenile court sustained the jurisdictional petition and set a disposition hearing.[2] At the disposition hearing on March 18, 2021, the court declared B.T. a dependent of the juvenile court, removed B.T. from parental custody, bypassed reunification services for Mother and Father, and scheduled a section 366.26 hearing.

## D. The First Section 388 Petition

After the disposition hearing, Mother completed inpatient drug treatment and began participating in a parenting education program. As to visitation, Mother was approved for 8 hours per week of supervised in-person visits. She initially declined in-person visits due to the COVID-19 pandemic and scheduled weekly virtual visits instead. Mother missed several virtual visits during this period, and SSA noted that, initially, she did "not make an effort to participate in the[se] visits." Generally, the visits she attended only lasted for around 20 minutes and had limited interaction. For example, Mother did "not stay in front of the computer screen for the duration of the entire visit" which meant B.T. was "mainly looking at the background of an office." Mother requested in-person visits in late April 2021. When in-person visitation resumed, she was attentive to B.T.'s needs and played appropriately with him. Mother gave birth to B.T.'s sibling, R.T., in June 2021.

On July 13, 2021, Mother filed a petition under section 388 requesting family reunification services. As changed circumstances, she cited her completion of an inpatient drug program and current residence in a women's shelter with her new child, R.T. SSA recommended granting the petition because Mother had addressed her

_____

[2] The juvenile court dismissed several counts pertaining to the Father that are not relevant to this appeal.

5

substance abuse issues and had "put herself in a position to be given the opportunity to reunify with the child." Further, her visits with B.T. had been positive, and she had shown good parenting skills while handling both B.T. and R.T. As part of its case plan, SSA recommended that Mother complete a domestic violence program and a parenting class, participate in counseling and a substance abuse group, and submit to random alcohol and drug testing, among other things.

The juvenile court granted Mother's section 388 petition on August 11, 2021. It took the section 366.26 hearing off calendar, approved SSA's proposed case plan, and set a review hearing for February 2022 (the status review hearing). The status review hearing was continued several times and eventually held on May 18, 2022.

*E. The Reunification Period*

In the leadup to the status review hearing, Mother completed her residential substance-abuse treatment program, moved into her own apartment, and secured employment. She completed her parenting class and participated in counseling. She nearly finished her domestic violence program, needing one more class for completion.

Mother's drug patch registered three positive tests for methamphetamine in December 2021 and January 2022, but she denied any use. All of her subsequent tests were negative.

As to visitation, Mother had eight weekly hours of supervised visits but typically visited B.T. for seven hours once a week. Visitation was inconsistent, and Mother reported to SSA that visits were "a little bit long." SSA reported that as of late October 2021, Mother had only visited B.T. once in the past five weeks. In early December 2021, SSA noted that since B.T. had been placed with the caregiver in November 2020, Mother had only visited 15 times and was late (anywhere from 10 minutes to two hours) for six of those visits. Mother only visited once during a three-month span from late October 2021 to late January 2022.

6

Mother's visitation marginally improved in early 2022. She visited with B.T. for a total of 21 hours in January and February 2022, i.e., three visits over two months. In March 2022, she visited for 14 total hours but missed two weeks of visits because R.T. was sick. The record does not list her total visitation hours for April 2022, but it shows she missed two visits that month. Mother claimed she missed the first visit due to a scheduled drug test with her probation officer that could not be done until 9:00 a.m., which conflicted with the visit. But her probation officer reported that drug testing began at 7:00 a.m., so Mother could have tested prior to her visit with B.T. rather than cancelling it. The second visit was canceled due to Mother's illness. The visits that did occur went well. B.T. engaged with Mother, called her "'mama,'" and gave hugs to his younger brother, R.T.

B.T.'s development during this period was generally normal. He was mentally and emotionally stable, but he experienced speech delays and began receiving speech therapy.

Though Mother had made progress and participated in services during this period, SSA was concerned by her inconsistent visitation and her ability to remain sober due to the three positive drug tests. As such, it recommended terminating reunification services and scheduling a section 366.26 hearing.

The juvenile court agreed with SSA. At the status review hearing on May 18, 2022, it terminated Mother's reunification services and scheduled a section 366.26 hearing. Despite this, its order contained a plan to gradually liberalize Mother's visitation. If Mother consistently attended all supervised visits with B.T. for six consecutive weeks, the order authorized SSA to increase her visitation hours by two hours per week until she reached 14 total hours per week. Once the 14-hour mark was met, if Mother attended all supervised visits with B.T. for four consecutive weeks, SSA was authorized to gradually begin transitioning to unsupervised visits.

*F. The Second Section 388 Petition*

Following the status review hearing, Mother consistently tested negative for drugs. She continued to comply with the terms of her probation and made progress on her services.

As to visitation, in late May 2022, Mother reported having a new work schedule and requested to visit on Saturdays from 9:00 a.m. to 1:00 p.m., reducing her visitation from seven hours to four hours per week. SSA asked Mother to provide additional days or times for visits with B.T. so she could have her full eight hours, but she did not respond until late July 2022. Mother consistently visited for four hours a week from late May 2022 to late August 2022. Though she was late to several visits, she only cancelled one visit during this period to celebrate R.T.'s birthday. Mother increased visits from four to seven hours per week starting August 20, 2022. The visits were generally good. B.T. referred to Mother as "'Mom,'" and he listened to her directions. He also appeared excited to see R.T. and to watch TV.

On September 13, 2022, Mother filed a second petition under section 388, requesting implementation of family maintenance services and cancellation of the section 366.26 hearing. She argued there had been changed circumstances since the status review hearing, specifically, she had "tested negatively for drugs, attended all her programs and maintained the sibling, [R.T.], on family maintenance in her home." She argued family maintenance would be better for B.T. because she had "frequent and continued contact [with B.T.], . . . a bonded relationship with the child, and the child would be placed with his sibling [R.T.]" The juvenile court scheduled the petition to be heard at the same time as the section 366.26 hearing.

Prior to the section 366.26 hearing, SSA reported that Mother continued to test negative for all substances and remained employed. As to visitation, Mother missed a visit on September 3, 2022, because she was ill. She then cancelled another visit on October 1, 2022, 10 minutes before it was supposed to start, because she did not feel

8

well. Mother also ended at least three visits several hours short. For two of these instances, she claimed she had to drug test for probation. But SSA noted that Mother's probation officer had previously reported that Mother could test before or after visits so she would not miss time with B.T. For the third instance, Mother decided mid-visit to leave early. Prior to leaving, she was overheard telling another parent that her "visits with [B.T.] were too long." By the time the caregiver arrived at the facility to pick up B.T., Mother had left and B.T. was being supervised by facility staff.

SSA recommended that the juvenile court terminate Mother's parental rights and that B.T. be referred for adoption. By that time, B.T. had been with the caregiver and her spouse for 22 months or roughly two-thirds of his life. The caregiver and her spouse were committed to B.T., they wanted to adopt him, B.T. appeared comfortable with them, and they had demonstrated the ability to meet his needs.

## G. The Combined Section 388 and Section 366.26 Hearings

The joint hearing on Mother's second section 388 petition and under section 366.26 began on October 17, 2022 and concluded on October 31, 2022. At the hearing, Mother testified that during visits, B.T. called her "Mom," and would hug her and R.T. at the beginning and end of each visit. She acknowledged that she did not see him for a four-to-five month period while she was in her inpatient drug treatment program, but she believed B.T. should be returned to her care because they still shared a bond, and B.T. also had a bond with R.T.

A social worker from SSA testified that Mother had recently been visiting for seven hours a week even though she had been granted eight hours of visitation. Because Mother had not visited consistently, she had not obtained additional visitation hours under the court's graduated plan after the status review hearing. The social worker was unaware of B.T. ever asking to see either Mother or R.T. outside of visits. She further testified that Mother had only inquired about B.T.'s speech therapy on one

9

occasion and that Mother had never attended any of his medical or speech therapy appointments.

The caregiver testified that although she and Mother had been in direct contact, Mother had never reached out about B.T.'s well-being. B.T. never asked for Mother or R.T. while in her care, nor did B.T. ever talk about Mother. Mother had never requested to attend any of B.T.'s medical appointments, nor had she ever followed up with the caregiver about them.

Following the presentation of evidence, the juvenile court denied Mother's section 388 petition and terminated her parental rights. As to the section 388 petition, the court noted that Mother had not met either prong of the two-prong test. For the first prong, Mother had failed to show changed circumstances. The court explained that it had initially set a section 366.26 hearing due to Mother's inconsistent visitation. Mother's record of visitation continued to be inconsistent and she had voluntarily decreased her weekly visitation hours at times. For the second prong, the juvenile court found Mother had not shown reunification services were in B.T.'s best interest. B.T had substantial connection with the caregiver, whom he had lived with for nearly two years. Mother's relationship with B.T. did not "rise to the level of a substantial positive emotional attachment." Likewise, B.T.'s relationship with R.T. was "minimal at this stage."

As for termination of Mother's parental rights, the juvenile court found B.T. to be adoptable. It then denied Mother's requests for application of the parental-benefit exception or the sibling-relationship exception. As to the former, Mother had not shown regular visitation and contact with B.T. Further, she had not shown that B.T. had a substantial positive emotional attachment to her. B.T. was nearly three years old and had been out of Mother's custody for the majority of his life. She had failed to consistently visit him, which prevented the necessary emotional attachment from forming. Likewise, there was no showing that termination of parental rights would be detrimental to B.T.

As to the sibling-relationship exception, the juvenile court explained that the relationship between B.T. and R.T. was limited. They had not been raised in the same home. B.T. had already been removed from Mother's care by the time R.T. was born. While the two had shared visits together, visitation was inconsistent. Nor was there any evidence of shared significant experiences between them.

Mother appeals the juvenile court's order, arguing it erred by denying her section 388 petition and by terminating her parental rights.

## II

## DISCUSSION

### A. The Section 388 Petition

"The essence of a section 388 petition is the petitioner's assertion that she or he can demonstrate, by a preponderance of the evidence, that new evidence or a change of circumstances exists warranting a finding that the best interests of the minor child will be served if a previous order of the court is changed, modified or set aside." (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 382.) Section 388 petitions are analyzed under a two-prong standard. "'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.' [Citation.] '[T]he change in circumstances must be substantial.'" (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) Here, the juvenile court found that Mother had failed to establish either prong.

We begin with the first prong. "If the juvenile court has ruled the moving party failed to carry his or her initial burden to demonstrate new evidence or change of circumstance, . . . the question for the reviewing court is whether that finding is erroneous as a matter of law." (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.) Mother must show the evidence compels a finding in her favor. (*In re I.W.* (2009) 180 Cal.App.4th

11

1517, 1528, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "Specifically, the question becomes whether [Mother's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.*, at p. 1528.)

As explained above, the juvenile court found there had been no change in circumstances as to visitation. Mother has failed to show any error in this finding. While Mother's visitation became more consistent from May 2022 onward, the record reflects she did not consistently visit for her full eight hours per week. Rather, from late May to late August 2022, she only visited for four hours a week, only half of her full allotment. Further, she was late to several of these visits. Likewise, in September and October 2022, Mother missed multiple visits, and she ended at least three visits several hours short. In one of those instances, Mother left B.T. alone at the care facility before the caregiver arrived and was heard commenting that her visits with B.T. "were too long."

Significantly, a section 388 petition must show a substantial change. Further, the petition must show the change in circumstance is largely complete and not simply a work in process. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) "A petition which alleges merely *changing* circumstances . . . would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, italics added, disapproved of on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).) The above evidence does not compel a finding that Mother had shown a changed circumstance as to visitation. At most, she has established *changing* circumstances, which is insufficient to meet the burden of a section 388 petition. Since Mother has not met her burden on the first prong, we need not address the

12

juvenile court's finding as to the second prong. (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 845.)

We note that Mother has also argued the juvenile court erroneously conflated the requirements for a section 388 petition with the standards for termination of parental rights under section 366.26. We disagree. As set forth above, the court made separate findings on the section 388 petition and on termination of parental rights. The court simply explained that some of its findings as to the parental-benefit exception overlapped with its finding that granting the section 388 petition was not in B.T.'s best interests. This analysis was not improper, as one of the factors to consider in evaluating the child's best interests under section 388 is "the strength of the child's bond with his or her new caretakers compared with the strength of the child's bond with the parent." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 224.) Much of the same evidence was relevant to evaluating the strength of B.T.'s bond with Mother for purposes of the parental-benefit exception. The court did not, as Mother argues, deprive her of any rights under section 388. Further, to the extent any error occurred, it would have only effected the court's analysis on the second prong, not the first prong.

### B. Termination of Parental Rights

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, [section 366.26] lists plans in order of preference and provides a detailed procedure for choosing among them. . . . [T]he court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the

13

court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in *exceptional* circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631, italics added.)

### 1. *The Parental-Benefit Exception*

The parental-benefit exception, "is limited in scope." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632.) A parent must prove three elements by a preponderance of the evidence to establish the exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id.* at pp. 631, 636-637.) The juvenile court found Mother had not met any of these elements.

We begin with the first element, regular visitation and contact. This element "is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.] Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' [citation] but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact — here, as throughout, the focus is on the best interests of the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The first element is reviewed under the substantial evidence standard. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Under this standard, the juvenile court's "determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the . . . court might have reached a different result had it believed other evidence.'" (*Id.* at p. 640.) Here, the court's

14

visitation finding is supported by substantial evidence. In the beginning of this dependency proceeding, Mother missed several virtual visits with B.T. Further, the visits that did occur only lasted for around 20 minutes and had limited interaction. After transitioning to in-person visits, Mother had significant gaps between visits. SSA reported that in late October 2021, Mother had only visited B.T. once in the past five weeks. Further, no visitation appears to have occurred in November or December 2021.

Visitation slightly improved starting in January 2022. From January to March 2022, Mother visited for 35 total hours. But this equals less than 12 hours per month on average, when she had been approved for eight hours of visitation per week. She also missed several visits in April 2022. While Mother became more consistent with visitation from May 2022 onward, she generally only visited for four hours a week, half the amount of her allotment. After she increased visitation to seven hours per week in late August 2022, she ended multiple visits several hours short. And, as documented above, she once abruptly ended one visit early and left B.T. in the care of the supervising facility before the caregiver could arrive to pick him up.

Given the long gaps between visits during the early portion of this dependency case and Mother's inability to utilize all of her allotted visitation hours throughout this case, the juvenile court's finding on the visitation element is supported by the record. We acknowledge that several times Mother had reasonable excuses for missing visits, such as illness. But the visitation element is not meant "to punish parents or reward them for good behavior in visiting or maintaining contact." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Rather, it is intended to ensure children have sufficient visitation to build a significant emotional connection to their parent. (See *ibid.*) As such, we focus not on Mother's reasons for missing visits but on the impact irregular visitation had on B.T. Given his young age, the reasons behind the missed visits are irrelevant. Each missed visit deprived him of an opportunity to bond with Mother, regardless of her reasons.

Even if Mother could establish the first element, she has not met her burden under the third element, *i.e.*, she has not shown termination of parental rights would be detrimental to B.T. Two standards of review are applied to this element. The juvenile court's factual findings are reviewed for substantial evidence. But "the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "An abuse of discretion is only demonstrated when no reasonable judge could have made the challenged order." (*In re Marriage of Barth* (2012) 210 Cal.App.4th 363, 374.)

In evaluating the third element, the juvenile court "decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Ibid.*) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.)

"'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) To depart from this legislative preference, a "'parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child.'" (*In re A.G.* (2020) 58 Cal.App.5th 973, 995.) "[T]his type of relationship typically arises from day-to-day interaction, companionship and shared experiences, and may be continued or developed by consistent and regular visitation after the child has

16

been removed from parental custody." (*In re S.B.* (2008) 164 Cal.App.4th 289, 298-299, italics omitted.)

Here, B.T. was removed from Mother's care when he was only nine months old. He has spent the vast majority of his life with the caregiver and her spouse. Nothing in the record suggests he and Mother have developed the type of bond necessary to apply the parental-benefit exception. SSA's reports show Mother and B.T. have a loving relationship and have shared pleasant visits together. But this evidence alone in insufficient to show that she occupies a parental role in B.T.'s life. (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 995.) Moreover, the record shows B.T. does not talk about Mother outside of visits, which indicates their relationship – while loving – is limited. As such, nothing in the record shows the bond between Mother and B.T. is so strong that it must be prioritized over B.T.'s potential adoption.

### 2. *Sibling-Relationship Exception*

The sibling-relationship exception "provides an exception to termination of parental rights when '[t]here would be substantial interference with a child's sibling relationship.'" (*In re D.O.* (2016) 247 Cal.App.4th 166, 173.) It is intended "to preserve long-standing sibling relationships that serve as 'anchors for dependent children whose lives are in turmoil.'" (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437.) When evaluating the exception, juvenile courts consider a nonexclusive list of factors, including, "'[(1)] whether the child was raised with a sibling in the same home, [(2)] whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and [(3)] whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption.'" (*In re D.O.*, *supra*, 247 Cal.App.4th at p. 173.)

The sibling-relationship exception is rarely applied. (*In re D.O.*, *supra*, 247 Cal.App.4th at p. 174.) Mother had the burden below to prove this exception. (*Id.* at p.

17

173.) On appeal, "we apply the substantial evidence standard to the juvenile court's underlying factual determinations, and the abuse of discretion standard to the court's weighing of competing interests." (*Id*. at p. 174.)

Nothing in the record shows application of this exception is warranted. B.T. and R.T. never lived in the same home. The two siblings only encountered each other during Mother's visits with B.T., which, as set forth above, were inconsistent. Further, B.T. did not ask about R.T. outside of visits. While B.T. gave R.T. hugs during visits and was excited to play with him, this is insufficient to establish the exception. In *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293, the child visited "with her half siblings between two and four times a month" for two years. While "the minor clearly enjoyed the time she spent with her half siblings, there was no evidence that the detriment she might suffer if visits ceased presented a sufficiently compelling reason to forgo the stability and permanence of adoption by caretakers to whom she was closely bonded." (*Ibid*.) Likewise, nothing in the record indicates any harm B.T. may suffer by severing his relationship with R.T. outweighs the benefits of adoption.

III

DISPOSITION

The juvenile court's order is affirmed.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

BEDSWORTH, J.

18